# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 30, 2003

## STATE OF TENNESSEE v. BRANDON CHARLES CAIN

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 234536      Stephen M. Bevil, Judge**

---

**No. E2002-01196-CCA-R3-CD**
**May 29, 2003**

---

The Defendant, Brandon Charles Cain, was convicted by a jury of attempted first degree murder, a Class A felony. In this direct appeal, the Defendant raises two evidentiary issues: (1) whether the trial court erred by denying his motion to suppress statements he gave to law enforcement officers; and (2) whether the trial court erred by allowing the State to show the jury a videotape in which the victim's injuries were depicted. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Michael A. Little, Chattanooga, Tennessee, for the appellant, Brandon Charles Edward Cain.

Paul Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Bill Cox, District Attorney General; and Barry A. Steelman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A brief review of the pertinent facts of this case will be helpful to an understanding of our resolution of the issues before us. At around 7:40 a.m. on October 4, 2000, Bill Kinneman was leaving his residence at the Lakeshore Apartments in Chattanooga to go to work. He noticed a man, later identified as Dean Cain, Sr., lying in the parking lot of the apartment complex. Mr. Kinneman testified that the victim was covered in blood. The victim had a massive head wound, and brain matter was coming out of his head. Mr. Kinneman called 911.

Officer Jim Brock was the first officer on the scene. He also described the victim as being covered in blood with brain matter protruding from his head. Officer Brock discovered a trail with blood on it leading from where the victim was lying to the rear of the apartment building. He

followed the trail to a rear patio and sliding glass door. When he peered through the glass door, he saw a "horrible fight scene, where there was a couch just covered in blood, blood on the floor."

Sergeant Tim Carroll was the lead detective in the investigation regarding the attack on Dean Cain, Sr. He learned that the victim was employed by the Atlanta Gas and Light Company and that he lived with two of his sons, Brandon Cain, the defendant in this case, and Ben Cain. Sergeant Carroll also learned that the victim's ex-wife, Mary Cain, her boyfriend, Robert Fox, and the victim's other son, Daniel Cain, lived in an extended stay motel in Chattanooga. Sergeant Carroll discovered that the victim had a life insurance policy through his employer that contained an accidental death provision of four times his salary and double indemnity.

Sergeant Carroll began searching for the victim's Ford Ranger pickup, which was located at the Battery Heights Apartments, where the Defendant's girlfriend, Miranda Vaughn, lived. The Defendant was observed by a surveillance team leaving the apartments in the truck. Officers followed him to a liquor store, where he was stopped by the police. The Defendant, Mary Cain, Robert Fox, and Ben Cain were all taken to the police department for questioning.

When the Defendant was questioned on the night of October 4, he denied having any involvement in the attack on his father. However, after being questioned extensively on October 5, the Defendant told police officers that he was the sole person involved in the beating of the victim. He told them that he and the victim had been arguing over his use of the victim's pickup truck, and the victim threatened to take it away from him. At that point, the Defendant said he struck his father in the head with an aluminum baseball bat. He took the officers to the woods behind his girlfriend's apartment complex, where he had hidden a bag containing the clothes that he wore during the assault. He also took the officers to a field near the extended stay motel where he had disposed of the baseball bat.

However, upon further questioning, the Defendant admitted that he was not the only person involved in the attack on the victim. He stated that he had conspired with his mother, Mary Cain, and her boyfriend, Robert Fox, to kill the victim for the proceeds of his life insurance policy. He further admitted that he and his brother Ben entered the victim's apartment, where he struck the victim several times in the head with the aluminum baseball bat while the victim was asleep on the couch. The Defendant and Ben dragged the victim to the parking lot of the apartment, where they attempted to put him in the bed of a truck that the Defendant had taken from his former employer. Because the victim was too heavy to lift, the Defendant and Ben left him lying in the parking lot.

The first issue raised by the Defendant is whether the trial court erred by overruling his motion to suppress the statement he gave to police officers. Specifically, he contends that his statement was not knowingly and voluntarily given. It is apparent from the record that the Defendant signed a written waiver of his Miranda rights. In order to be valid, a waiver of Miranda rights must be voluntarily, knowingly, and intelligently given. See Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966); State v. Van Tran, 864 S.W.2d 465, 472 (Tenn. 1993). The issue of the voluntariness of the waiver must be decided based on the totality of the

circumstances surrounding the waiver in each particular case. See Van Tran, 864 S.W.2d at 472-73; State v. Benton, 759 S.W.2d 427, 431-32 (Tenn. Crim. App. 1988). The factual findings of a trial court will not be disturbed on appellate review unless the evidence preponderates against them. See State v. Kelly, 603 S.W.2d 726, 729 (Tenn. 1980).

In this case, Officer Tim Carroll of the Chattanooga Police Department testified at the suppression hearing that he took two statements from the Defendant. The Defendant gave his first statement on October 4, 2000, the date of the offense. Detective Carroll testified that he advised the Defendant of his Miranda rights before he took the Defendant's statement, and the Defendant signed a waiver of those rights. In his first statement, the Defendant denied all knowledge of the attack on his father. Detective Carroll requested that the Defendant take a polygraph test the following day, which the Defendant agreed to do. On October 5, 2000, the Defendant returned to the police station at about one o'clock in the afternoon to submit to a polygraph test. The test was administered by Sergeant Susan Blaine of the Chattanooga Police Department. She testified that before the Defendant took the polygraph examination, he signed both a polygraph waiver form and a constitutional rights waiver form. The test lasted between two and two and one-half hours. According to Sergeant Blaine, the results of the examination indicated that the Defendant was not telling the truth regarding his involvement in the assault on his father. Sergeant Blaine confronted the Defendant about his apparent deception, but he insisted that he was not involved in any way. Detective Carroll testified that he and Detective Mathis spoke with the Defendant for approximately two hours regarding his performance on the polygraph examination. Detective Carroll admitted that during those two hours, he and Detective Mathis repeatedly told the Defendant that they knew he was involved in the crime and that he needed to confess.

Lieutenant Angel then spoke with the Defendant for approximately thirty to forty-five minutes. After that meeting, Lieutenant Angel reported to Detective Carroll that the Defendant wanted to make a statement. The Defendant agreed to take the detectives to the place where he had disposed of the aluminum baseball bat and the clothing worn during the attack. At approximately 8:24 that evening, Detective Carroll spoke with the Defendant again. Detective Carroll advised the Defendant of his Miranda rights, and the Defendant signed a rights waiver form. In this statement, the Defendant told the detective that he had beaten his father. Detective Carroll testified that the Defendant was not denied food, drink, or restroom breaks during either interrogation. Furthermore, Detective Carroll stated that, at the end of the second statement, Detective Mathis conversed with the Defendant regarding how he had been treated during the questioning. Both Detective Carroll and Detective Mathis testified that the Defendant responded that he had been treated fairly and with respect and that he had not been forced to answer questions.

The Defendant testified at the suppression hearing that, after he took the polygraph examination, Sergeant Blaine told him that he failed the test and that he needed to tell the truth regarding his involvement in the attack on Mr. Cain. The Defendant testified that at one point he requested to leave the room and smoke a cigarette, but Sergeant Blaine did not allow him to do so. Detectives Carroll and Mathis also repeatedly told him that they knew he was involved and he needed to tell the truth, and he stated that he did not feel that he was free to leave. On cross-

examination, the Defendant admitted that Detective Carroll read him his Miranda rights on the night of October 4, 2000, and that he understood them and waived them. He also admitted that Sergeant Blaine reviewed his rights with him on October 5, 2000, before he took the polygraph examination and that he again waived those rights. Finally, the Defendant admitted that Detectives Carroll and Mathis provided him with another rights waiver form on the evening of October 5 before he confessed to beating his father. The Defendant testified that the detectives "talked badly" to him. He stated that they told him that "[he] wasn't allowed to breath air because of what [he] had done to [his] father," he was "a worthless piece of shit," and if he did not confess, they would "lock [him] up for life." He complained that he signed each of the rights waiver forms because he "was scared." However, he admitted that he understood that he did not have to speak with the police officers, but that he did so voluntarily.

The trial court found that the Defendant's confession was not the result of coercion and that it was given "knowingly and voluntarily and intelligently." The evidence does not preponderate against the findings of the trial court. Nowhere in the record is there any evidence that the Defendant did not voluntarily, knowingly, and intelligently waive his constitutional rights. Although the Defendant was questioned for several hours regarding his involvement in the beating of his father, he testified that he understood that he did not have to speak with the police. The Defendant executed a written waiver of his constitutional rights no less than three times, and he testified that each time he did so voluntarily. This issue is without merit.

Next, the Defendant contends that the trial court erred by allowing the State to show the jury a videotape in which the victim's injuries were depicted. The Defendant asserts that the evidence was cumulative and that the probative value of the video was outweighed by the risk of unfair prejudice. See Tenn. R. Evid. 403. The video was shot by the victim's brother, Mark Cain, approximately three and one-half months after the attack. The video was not included in the record on appeal. When a defendant seeks review of an issue in this Court, it is the defendant's duty to prepare a record that conveys a fair, accurate and complete account of what transpired with respect to the issues raised on appeal. See State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). Because the record is inadequate with respect to the admissibility of the video, we are precluded from reviewing this issue. See State v. Bane, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993).

We note, however, that the contents of the videotape are discussed in the trial transcript. Based on this discussion, it appears unlikely that the Defendant's argument would gain him relief. Apparently, the video depicts the victim, Dean Cain, Sr., in a medical facility approximately three and one-half months after the attack. According to the trial transcript, the victim was wearing a soft helmet, and his brother asked him how he was doing. The victim does not respond in any way. The State argued that the video reflects that a few months after the attack, the victim was "severely incapacitated, he was in a wheelchair, he couldn't speak, and to some degree, that may explain to the jury why he could not communicate and why he did not have the mental ability to communicate to anyone about who had done this to him." In finding that the probative value of the tape was not outweighed by the risk of unfair prejudice, the trial judge stated, "I think it does show the victim

three months after this happened and the condition he was in, which is markedly different from the condition that he's in today and I think the jury is entitled to see that."[1]

Assessing the probative value and danger of unfair prejudice regarding evidence falls within the trial court's discretion. See State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993). This Court will only reverse a trial court's decision if the trial court abused its discretion. See State v. Williamson, 919 S.W.2d 69, 79 (Tenn. Crim. App. 1995).

In this case, it does not appear that the trial court abused its discretion by allowing the prosecution to play the videotape for the jury. The video, assuming it depicted the nature and severity of the victim's injuries, was relevant to show an intent to kill. See State v. Samuel Paul Fields, No. 01C01-9512-CR-00414, 1998 WL 79917, at *6 (Tenn. Crim. App., Nashville, Feb. 26, 1998). Furthermore, the record does not indicate that the footage contained in the video was particularly grisly; therefore the risk of unfair prejudice does not appear to be high.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

_____

[1] The victim testified before the jury at trial. At the trial, the victim continued to wear the soft, protective helmet. He was able to communicate; however, he had no recollection of the attack. Ostensibly, the victim's physical condition was much improved at the time of his testimony compared to the time of the making of the video tape.